# UNITED STATES DISTRICT COURT

## Eastern District of New York

| | |
|---|---|
| Dr. David Schwartz,<br><br>              Plaintiff,<br><br>v.<br><br>The City of New York and<br>Lorelei Salas, in her official capacity as<br>Commissioner of the Department of<br>Consumer Affairs,<br><br>              Defendants. | Case No.: 1:19-CV-463-RJD-ST<br><br><br>PLAINTIFF'S MEMORANDUM IN<br>SUPPORT OF MOTION FOR<br>PRELIMINARY INJUNCTION |

# **Contents**

Table of Authorities ...................................................................................... iii

Preliminary Statement .................................................................................. 1

Governing Legal Standards ........................................................................... 1

Statement of Facts ....................................................................................... 2

    A.    Dr. Schwartz and his patients. ........................................................ 2

    B.    The new Counseling Censorship Law and implementing rules. ............ 6

I.    The Counseling Censorship Law violates the free speech and due process rights of Dr. Schwartz. ................................................................. 8

    A.    The Censorship Law violates Dr. Schwartz's free speech rights. (Count I) ..................................................................................... 8

        1.    The Censorship Law is subject to strict scrutiny. ..................... 10

        2.    The Censorship Law cannot survive strict scrutiny. ................. 12

            a.The Counseling Censorship Law cannot survive strict scrutiny because, as enforced against speech, it does not further any cognizable governmental interest ................... 13

            b. The Counseling Censorship Law cannot survive strict scrutiny because it is *overbroad* rather than "narrowly tailored." ............................................................... 14

            c. The Counseling Censorship Law cannot survive strict scrutiny because it is radically *underinclusive* ........................ 15

        3.    The Counseling Censorship Law cannot survive strict scrutiny because it is not the least restrictive alternative. ....... 16

    B.    The Law is so vague that it violates Dr. Schwartz's right to due process protected by the 14th Amendment. (Count II) ........................ 16

II.    The Counseling Censorship Law violates free speech rights and protected liberty interests of the clients of Dr. Schwartz. (Count III) ........... 18

    A.    Dr. Schwartz has standing to assert the rights of his patients threatened by the Counseling Censorship Law. ................................. 18

    B.    The Counseling Censorship Law violates the right of Dr. Schwartz's patients to receive desired information and counsel. ........ 20

III.    The Counseling Censorship Law violates the free exercise rights of Dr. Schwartz and of his clients. (Counts IV & V) ................................. 20

    A.    The Counseling Censorship Law violates free exercise rights because it interferes with the right of patients to pursue their

chosen goals, and the right of Dr. Schwartz to advise them consistently with historic teachings of their shared faith. .................. 21

B.    The Counseling Censorship Law violates free exercise rights because it cannot survive strict scrutiny............................................ 24

IV.   The balance of harms favors granting a preliminary injunction. ................... 25

Conclusion .......................................................................................................... 25

# Table of Authorities

<u>**Cases**</u>

*ACLU v. Clapper,*
    804 F.3d 617 (2d Cir. 2015) ............................................................ 2

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ............................................................... 12, 16

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969) .................................................................... 13

*Central Rabbinical Congress of the United State & Canada v. New York City*
    *Department of Health & Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014) ........................................................ 25

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) ......................................................... 15, 24, 25

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) .................................................................... 10

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) ...................................................................... 17

*Conant v. Walters,*
    309 F.3d 629 (9th Cir. 2002) ...................................................... 10

*Dennis v. United States,*
    341 U.S. 494 (1951) .................................................................... 18

*Eisenstadt v. Baird,*
    405 U.S. 438 (1972) ............................................................... 14, 19

*Elrod v. Burns,*
    427 U.S. 347 (1976) ...................................................................... 2

*Employment Division, Department of Human Resources of Oregon v. Smith,*
    494 U.S. 872 (1990) ................................................... 21, 22, 23, 24

*FCC v. League of Women Voters of California,*
    468 U.S. 364 (1984) ................................................................. 13-14

*Florida Star v. B.J.F.,*
    491 U.S. 524 (1989) .................................................................... 15

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) .................................................................... 13

*Griswold v. Connecticut,*
    381 U.S. 479 (1965) ................................................................. 9, 20

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 U.S. 171 (2012) .................................................................. 21, 22

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,*
    515 U.S. 557 (1995) ............................................................................. 14

*International Society for Krishna Consciousness, Inc. v. Barber,*
    650 F.2d 430 (2d Cir. 1981) ........................................................ 21, 22

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ............................................................................. 19

*Lanzetta v. New Jersey,*
    306 U.S. 451 (1939) ............................................................................. 17

*Maryland v. Joseph H. Munson Co., Inc.,*
    467 U.S. 947 (1984) ...................................................................... 19, 20

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    138 S. Ct. 1719 (2018) ....................................................................... 24

*McCullen v. Coakley,*
    134 S. Ct. 2518 (2014) ....................................................................... 13

*McEachin v. McGuinnis,*
    357 F.3d 197 (2d Cir 2004) ........................................................ 23, 24

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ............................................................................... 9

*New York Progress & Protection PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ................................................................ 2

*NIFLA v. Becerra,*
    138 S. Ct. 2361 (2018) ................................................... 9, 10, 12, 19

*Obergefell v. Hodges,*
    135 S. Ct. 2484 (2015) ................................................................. 9, 21

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972) ............................................................................. 17

*Police Department of Chicago v. Mosley,*
    408 U.S. 92 (1972) ............................................................................... 11

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992) ............................................................................. 11

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .......................................................... 10, 11, 12

*Republican Party of Minnesota v. White,*
    416 F.3d 738 (8th Cir. 2005) ............................................................ 12

*Rosenberger v. Rector and Visitors of the University of Virginia*,
  515 U.S. 819 (1995) ........................................................................... 11

*Skinner v. Oklahoma*,
  316 U.S. 535 (1942) ............................................................................. 9

*Texas v. Johnson*,
  491 U.S. 397 (1989) ........................................................................... 14

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017) ................................................................. 21-22

*Turner Broadcasting System, Inc. v. FCC*,
  512 U.S. 622 (1994) ........................................................................... 11

*United States v. Caronia*,
  703 F.3d 149 (2d Cir. 2012) .............................................................. 10

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ........................................................................... 20

*Vazzo et al. v. City of Tampa*,
  No. 8:17-cv-2896-T-02AAS (M.D. Florida January 30, 2019) ......................... 16

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................... 20

*Wollschlaeger v. Florida*,
  848 F.3d 1293 (11th Cir. 2017) .......................................................... 10

*Young v. American Mini Theaters*,
  427 U.S. 50 (1976) ............................................................................. 17

## Statutes

New York City Administrative Code Title 20, Chapter 5 § 20-824-827 ................. 6, 7

Rules of the City of New York § 6-69 .................................................. 7-8

N.Y. C.P.L.R. § 4507 ........................................................................ 9

## Other Authorities

NYC Consumer Affairs, *Conversion Therapy is Illegal in New York City*,
  https://www1.nyc.gov/site/dca/consumers/conversion-therapy-is-
  illegal.page ................................................................................. 8

## Preliminary Statement

Dr. David Schwartz, a practicing psychotherapist, moves this Court to enjoin the enforcement, both on its face and as-applied, of newly enacted Law Number 2018/22 of the City of New York ("the Counseling Censorship Law")—a law that censors private conversations between doctor and patient in violation of the First and Fourteenth Amendment rights of both Dr. Schwartz and his patients.

The patient-psychotherapist relationship requires trust and openness between patient and counselor as they explore together the patient's most intimate concerns and personal goals. It is the last place where government agents should intrude to declare disfavored topics and ideas off limits, yet the Counseling Censorship Law does just that. Specifically, if a patient is experiencing same-sex attractions, or a sense of gender identity that is discordant with his or her biological sex, the Counseling Censorship Law flatly prohibits the psychotherapist from offering any thoughts to assist the patient in pursuing even a personally chosen goal of reducing same-sex attraction, or achieving comfort in a gender identity congruent with the patient's physical body and reproductive nature.

Because even the prospect of enforcement chills free and open discussion between Dr. Schwartz and his patients, and because as detailed below Dr. Schwartz has a strong probability of prevailing on the merits, enforcement of the Counseling Censorship Law against Dr. Schwartz should be preliminarily enjoined pending resolution of this case on the merits.

## Governing Legal Standards

To obtain a preliminary injunction, the moving party must ordinarily show:

(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the balance of hardships tips in his favor; and (4) an injunction is in the public interest. *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). But where First Amendment rights are at issue (as here), the test reduces essentially to a single prong: "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 488 (2d Cir. 2013). This is so because the deprivation of rights itself "for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976); protection of First Amendment rights is per se "in the public interest," *Walsh,* 733 F.3d at 488; and the balance of hardships is entirely one-sided because "the Government does not have an interest in the enforcement of an unconstitutional law." *Id.*

## Statement of Facts

### A. Dr. Schwartz and his patients.

Plaintiff Dr. Schwartz is a counselor and psychotherapist with a general practice in Brooklyn, New York. (Decl. of David Schwartz in Supp. of Mot. for Prelim. Inj. ("Schwartz Decl.") ¶ 1.) He was employed by the Veterans Administration for many years, and has served as a field instructor for numerous respected universities, and has maintained a private practice for decades. (*Id.* ¶¶ 5, 8-9.) As detailed in the accompanying Declaration, Dr. Schwartz has extensive experience counseling patients to overcome or ameliorate a wide range of emotional, addictive, relational, and psychological problems. (*Id.* ¶¶ 6, 8, 11-12, 14-18, 21-22, 24.)

2

Dr. Schwartz is an Orthodox Jew who is a member of the Chabad Lubavitch community in Crown Heights, Brooklyn. (*Id.* ¶¶ 1, 10.) Almost all of his patients today also follow the Orthodox Jewish faith. (*Id.* ¶ 13.) Dr. Schwartz's practice as a psychotherapist is not to pressure his patients or tell them what they ought to do. (*Id.* ¶ 20.) Instead, his approach to psychotherapy seeks to help patients understand themselves and achieve their own goals for themselves and their relationships. (*Id.* ¶¶ 16, 21.) However, both his patients' personal goals and Dr. Schwartz's counsel are informed by perspectives on human nature and a life well lived that are grounded in their Jewish faith, and his patients often choose and trust him as a counselor for that very reason. (*Id.* ¶¶ 13, 19, 23, 26.)

Among the wide range of problems and goals that patients bring into his office, some patients ask Dr. Schwartz to assist them in reducing same-sex attractions and increasing their attraction to the opposite sex. (*Id.* ¶ 27.)

An individual's goals in this regard may be driven by a desire for a natural biological family, by religious conviction, and by personal philosophy. (*Id.* ¶¶ 41-48, 58.) Some patients who seek Dr. Schwartz's assistance desire to develop or strengthen heterosexual attraction so that they can enter into a stable heterosexual marriage and form a biological family. (*Id.* ¶ 41.) Indeed, participating in the small society that consists of a mother, father, and their mutual offspring has been viewed across virtually all human cultures as one of the greatest sources of joy in life.

Patients who seek the assistance of Dr. Schwartz in this area have also included individuals who have already entered into a heterosexual marriage, given

life-long promises, and begotten or borne children. (*Id.* ¶ 42.) These individuals consider the promises made and the obligations incurred to their husband or wife and children to be more important to their personal integrity and identity than are their subjective sexual attractions. (*Id.* ¶ 43.)

Further, one of the teachings of Orthodox Judaism specifically is that it is both a blessing and a sacred obligation for men and women to join together in marriage to raise up a new generation of children dedicated to G-d. (*Id.* ¶ 48.) In addition, the spiritual guide of the Lubavitcher Orthodox Jewish community, the late Rebbe Menachem Schneerson, taught that the individual always has the capacity to change towards obedience to the teachings of the Torah. (*Id.* ¶¶ 49-52.)

Indeed, it is fundamental to the traditional Orthodox Jewish ethic that a person's lifetime involves an almost constant spiritual campaign to direct or even deny physical drives and desires in order to serve G-d properly. (*Id.* ¶ 55.) Such discipline includes denying oneself the pleasures of non-kosher foods or, on Yom Kippur, of any food at all, in order to achieve spiritual goals. (*Id.*) The denial or channeling of physical drives in Judaism in accordance with the dictates of the Torah applies to needs beyond food and to emotional drives as well, including the natural drive for sexual gratification which, in normative Jewish practice, is channeled exclusively to the relationship between husband and wife. (*Id.* ¶ 56.) Thus, Dr. Schwartz and any individual who considers his relationship with his Creator—as he understands it based on his Orthodox Jewish faith—to be more important and fundamental to his identity than are his sexual attractions, will take

4

a different position on human nature, the role of sexuality, and the possibility of human change than does the New York City Council. (*Id.* ¶¶ 53, 57.)

For any or all of these reasons, an individual who experiences same-sex attraction may decide that he or she does not wish to be defined or limited by that subjective attraction, and may instead desire to harmonize his or her sexual attractions with the objective purposes of sexual differentiation and reproduction revealed in nature. Dr. Schwartz is willing to, and does currently, provide counseling to such patients that seeks to help them achieve their goal of changing their sexual attractions to reduce or eliminate same-sex attractions, and develop or strengthen sexual attraction to the opposite sex.

Dr. Schwartz does not advertise. (*Id.* ¶ 13.) His patients come to him because of referrals from former patients, other members of the community, and area rabbis. (*Id.*) In counseling relating to sexual attractions, Dr. Schwartz never promises patients they will be able to achieve their goals for change. (*Id.* ¶ 31.) In working with such patients, Dr. Schwartz engages in no actions other than listening and talking, asking questions or offering ways of thinking about themselves and others that may help them make progress towards the change they desire. (*Id.* ¶¶ 18, 32-34.) Dr. Schwartz does not use any forms of physical or pharmaceutical treatment. (*Id.* ¶¶ 18, 32-33.) He just listens, and talks. (*Id.* ¶¶ 18, 32, 34.)

Not all of Dr. Schwartz's patients who have asked him to help them achieve increased opposite-sex attraction have achieved that goal. (*Id.* ¶ 35.) Some have chosen to stop pursuing it. (*Id.*) But across the years of his practice, Dr. Schwartz

has had a number of patients who have achieved their goal sufficiently to enter into heterosexual marriages and form of family they desire. (*Id.* ¶¶ 36-37.)

Dr. Schwartz currently has clients who seek his counsel to change their sexual attractions by reducing same-sex attraction and developing or enhancing opposite-sex attraction. (*Id.* ¶¶ 40, 59.) Dr. Schwartz has in the past provided such counsel to patients who request it, is doing so for patients currently, and wishes to continue to help patients this way in the future. (*Id.* ¶¶ 36, 40, 59.) The Counseling Censorship Law threatens Dr. Schwartz with fines quickly escalating to $10,000 per patient if he provides this counseling. (*Id.* ¶ 61.)

### B.   The new Counseling Censorship Law and implementing rules.

On December 31, 2017, the Council of the City of New York enacted Law Number 2018/22, now codified at New York City Administrative Code Title 20, Chapter 5 § 20-824-827. The Counseling Censorship Law declares: "It is unlawful for any person to offer or provide conversion therapy services." *Id.* § 20-825.

The Counseling Censorship Law defines "conversion therapy" services as "any services, offered or provided to consumers for a fee, that seek to change a person's sexual orientation or seek to change a person's gender identity to conform to the sex of such individual that was recorded at birth" (i.e., the individual's biological sex). *Id.* § 20-824. The Counseling Censorship Law carves out from its prohibitions "counseling that provides . . . understanding of a person's sexual orientation or facilitates a person's . . . identity exploration and development . . . as long as such services do not seek to change an individual's sexual orientation or gender identity." *Id.* § 20-825. The law does not explain how an individual's sexual

orientation or identity can "develop" without "changing." *Id.*

The Counseling Censorship Law expressly prevents patients from hearing ideas and suggestions from skilled professionals that the patients want to hear, and from obtaining help from such professionals to pursue the attractions, identity, relationships, and indeed the life that they desire.

An underlying motivation of the City Council in passing the Censorship Law is revealed by a report from the Committee on Civil Rights submitted to the City Council shortly before the Counseling Censorship Law was passed (the "November 29 Report"). (Decl. of Jeana Hallock in Supp. of Mot. for Prelim. Inj. ("Hallock Decl.") ¶ 2, Ex. 1). In that report, the Committee asserted that "groups" engaging in the practices to be prohibited are "often religious in nature." *Id.* Testimony taken by the Committee in support of the Counseling Censorship Law likewise repeatedly associated those practices with religious groups and individuals. *See id.* Nowhere in the November 29 Report or the testimony of the witnesses recorded in the legislative history of the law is a single example cited of any group or individual in New York City performing what it calls "conversion therapy," other than religious groups. *Id.*

Section 20-827 of the Counseling Censorship Law provides that the New York City Department of Consumer Affairs (the "DCA") "may promulgate such rules and regulations as it deems necessary to implement and enforce the provisions of this subchapter." Effective July 22, 2018, the DCA, under the direction of Commissioner Lorelei Salas, promulgated a new rule, § 6-69 of Subchapter B of Chapter 6 of Title

6 of the Rules of the City of New York ("the Penalty Rule"), fixing mandatory penalties for first, second, and subsequent violations of the Counseling Censorship Law in the amounts of $750, $4,500, and $10,000, respectively, per patient.

More recently, the DCA has actively worked to recruit anonymous informants, posting an online notice encouraging complaints against "any person offering or providing conversion therapy services," and promising that the "DCA will investigate" even anonymous complaints, and will fine violators. *See* NYC Consumer Affairs, *Conversion Therapy is Illegal in New York City*, https://www1.nyc.gov/site/dca/consumers/conversion-therapy-is-illegal.page (last visited Feb. 4, 2019) (Hallock Decl. ¶ 3, Ex. 2).

## I.    The Counseling Censorship Law violates the free speech and due process rights of Dr. Schwartz.

### A.    The Censorship Law violates Dr. Schwartz's free speech rights. (Count I)

It would be difficult to construct—even as a classroom exercise—a law that violates basic free speech principles from more angles than does the Counseling Censorship Law. The catalog is fatal.

*First*, the law censors—under penalty of heavy fines—a private conversation between consenting adults. Two adults may explore all 50 shades of sexual gray with each other behind closed doors in New York City, but certain shades of *conversation*, the City says, they may not have. This sort of censorship of conversations between adults is unprecedented.

*Second*, the Censorship Law intrudes the hand of the state into the most personal and important of private concerns: issues of personal identity, life goals,

sexuality, and relationships. Only a male-female union can be procreative, producing children who are the genetic offspring of both partners, and if human experience in all times and places may be permitted to be instructive, it is a reasonable and natural desire to attain to such a traditional family relationship. So the individual whose life goals include entering into a procreative marriage, but who experiences same-sex attraction that stands in the way of that goal, is in a difficult position, and may indeed desire expert counsel. Yet the Censorship Law bars the door to that counsel, and thus impedes the individual's pursuit of what the Supreme Court has repeatedly protected as one of the "basic civil rights of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942)—"the right 'to marry, establish a home and bring up children,'" *Griswold v. Connecticut*, 381 U.S. 479, 495 (1965) (Goldberg, J., concurring), (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)); *cf. Obergefell v. Hodges,* 135 S. Ct. 2484, 2598 (2015) ("It cannot be denied that" the Court's "right to marry" cases "presumed a relationship involving opposite-sex partners").

*Third*, while the Counseling Censorship Law does not limit its reach to mental health professionals, it includes them, and thus intrudes into the private doctor/patient relationship—a relationship to which openness is so essential that New York privileges it from intrusion. *See* N.Y. C.P.L.R. § 4507 (psychologist/patient privilege). "Doctors help patients make deeply personal decisions, and their candor is crucial," the Supreme Court wrote in *NIFLA v. Becerra,* 138 S. Ct. 2361, 2374 (2018), observing that it is characteristic, not of free

societies such as ours, but of tyrannies such as China during the Cultural Revolution, to "manipulate the content of doctor-patient discourse." *NIFLA*, 138 S. Ct. at 2374.

Striking a law that attempted to compel state-dictated speech by pregnancy resource centers, the Supreme Court in *NIFLA* further emphasized that its precedents forbid government content-based speech-restrictions absent "'persuasive evidence ... of a long (if heretofore unrecognized) tradition' to that effect." 138 S. Ct. at 2372. There is no "long tradition" in our country of government muzzling of doctors or psychotherapists, restricting their conversations with patients to government-approved viewpoints. To the contrary, such laws have consistently been found to violate the free speech rights of both doctors and patients. *See, e.g., Wollschlaeger v. Fla.,* 848 F.3d 1293 (11th Cir. 2017) (en banc) (striking law prohibiting doctors from asking questions about guns in the home); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) (striking law prohibiting doctors from recommending medical use of marijuana); *United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012) (government cannot prohibit off-label recommendation of drugs by physician where the recommended use is not illegal). The Counseling Censorship law is equally unconstitutional.

### 1.   The Censorship Law is subject to strict scrutiny.

Strict scrutiny is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997). A law that is subject to strict scrutiny is "presumptively unconstitutional," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). The Censorship Law is subject to strict scrutiny for multiple reasons.

A law that regulates speech is subject to strict scrutiny unless it is content neutral and viewpoint neutral. A law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2226-27. The Counseling Censorship Law is not content neutral: whether it applies to a particular counseling discussion depends on whether the doctor and patient are speaking about sexual orientation or gender identity.

More egregiously, the Counseling Censorship Law is not viewpoint neutral. The applicability of the law depends not only on the topic discussed, but on the "idea . . . expressed." *Id.* The psychotherapist may talk freely about sexual orientation or gender identity with his patient—so long as he does not encourage or assist change in sexual attractions, or toward an identity consonant with the patient's sex. The Supreme Court has vigorously condemned such viewpoint-based censorship:

> It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). . . . Discrimination against speech because of its message is presumed to be unconstitutional. *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641–643 (1994). . . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. *See R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992).

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-29 (1995). The Counseling Censorship Law stands at the very center of the bulls-eye targeted by the Court in *Rosenberger* and *Reed*. In a city that echoes with messages encouraging sexual freedom, choice, and experimentation, the City Council says "No!" to just one thing: counseling requested by a patient to help align his sexual attractions or gender identity with his reproductive biology.

11

What the Counseling Censorship Law seeks to do is to enforce—even in the privacy of the psychotherapeutic counseling room—the City Council's preferred orthodoxies on what are endlessly debated questions of philosophy, anthropology and faith. The City Council may believe that sexual desire and identity are immutable. The City Council may value the actualizing of sexual desires over forming procreative marriages, over honoring promises already made and duties owed to spouse and children, and over fidelity to the teachings of religious faiths. But what City Council may not do is compel private counselors to conform their speech to the City Council's beliefs—or be silent. These are not topics on which the City Council may "suppress unpopular ideas." *NIFLA*, 138 S. Ct. at 2374.

### 2.   The Censorship Law cannot survive strict scrutiny.

To survive strict scrutiny, the Defendants must overcome the presumption of unconstitutionality by demonstrating that the Counseling Censorship Law "furthers a compelling interest and is narrowly tailored." *Reed*, 135 S. Ct. at 2231. Defendants bear the burden of establishing this both on the merits and for purposes of defeating a request for preliminary injunction. *Ashcroft v. ACLU*, 542 U.S. 656, 660-61, 666 (2004). The Eighth Circuit has usefully summarized the implications of "narrowly tailored": "A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005).

In an as-applied challenge the government must demonstrate that the compelling interest would be injured if an exception were granted to the challenger. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-32 (2006) (applying the compelling interest test in the context of RFRA). Otherwise, application of the law in that setting cannot further the interest. The Counseling Censorship Law fails at every point.

   **a. The Counseling Censorship Law cannot survive strict scrutiny because, as enforced against speech, it does not further any cognizable governmental interest.**

The City fails scrutiny at the threshold. The Counseling Censorship Law applies to conversations between willing patients and a psychotherapist and thus serves no cognizable government interest. It is a lodestar of First Amendment jurisprudence that censorship can never be justified on the ground that it will prevent harm presented by *ideas* conveyed in speech. On the contrary, the risk that ideas have consequences provides no footing for censorship under our laws unless and until that risk rises to the high and immediate urgency defined by the "clear and present danger" test. *See Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (per curiam) (general promotion of KKK and vague allusions to armed resistance not sufficient to justify punishment for speech).

It is equally clear that the City does not have a cognizable interest in preventing the dissemination of ideas concerning personal, philosophical, scientific, and religious topics on the grounds that such ideas are (or it believes them to be) false or offensive. *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (citing *FCC v.*

13

*League of Women Voters of Cal.,* 468 U.S. 364, 377 (1984)) ("the First Amendment's purpose" is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (the "bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) ("the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful").

However much the City Council may dislike the ethics and goals of patients seeking counsel for unwanted sexual attractions and identity, "the [patient's] freedom to learn about them, fully to comprehend their scope and portent, and to weigh them against the tenets of the 'conventional wisdom,' may not be abridged." *Eisenstadt v. Baird*, 405 U.S. 438, 457 (1972) (Douglas, J., concurring). In short, no legitimate government interest is furthered by censorship in such a setting.

### b. The Counseling Censorship Law cannot survive strict scrutiny because it is *overbroad* rather than "narrowly tailored."

The City Council Committee on Civil Rights did not report that any of the actual *conduct* it listed for shock value—"institutionalization, castration, and electroconvulsive shock therapy"—has ever been performed as treatment for same-sex attractions within the boundaries of New York City, much less that anyone is doing such things today. *See* November 29 Report at 4 (Hallock Decl. ¶ 2, Ex. 1). Perhaps the City has the power to regulate such conduct and procedures. But the scope of the City's power to regulate such conduct by health professionals is not

before this Court. Instead, the Counseling Censorship Law prohibits even simple adult conversation if that conversation is oriented toward a *goal* of which the City Council disapproves. The Censorship Law is sweepingly overbroad with respect to any legitimate governmental interest.

### c. The Counseling Censorship Law cannot survive strict scrutiny because it is radically *underinclusive.*

If a statute like the Counseling Censorship Law is underinclusive with respect to the alleged interest to be served, this negates the legitimacy of the law in at least three distinct ways. First, it contradicts the claim that the law is "narrowly tailored" to the harm it purports to address. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 543-46 (1993). Second, the poor fit between the law and the alleged harm "raises serious doubts about whether [the government] is, in fact, serving, with this statute, the significant interests which [it] invokes" to justify the law. *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989). Third, underinclusiveness may justify an inference that the law was in fact targeted against religiously motivated practices, rather than being genuinely "of general applicability." *Lukumi*, 508 U.S. at 542-43, 545. Such is the case here.

The Counseling Censorship Law is severely underinclusive as a means toward the goal it purports to serve, triggering each of these concerns. Based on the recitations of the Committee Report, the harm that the law purportedly seeks to avoid is the psychic distress to individuals caused by misguided counsel about sexuality. (Compl. ¶ 47.) Even if this were a legitimate basis for governmental censorship (it is not), New York City is filled with sexual and relational advice

pointing in every conceivable direction, much of which may cause distress to those who follow it. Yet the City Council has not launched a general inquiry, nor banned "counseling that leads to feelings of psychological distress." Instead, it has exclusively named, targeted, and prohibited from counseling conversations a narrow category defined by current politics rather than by any demonstration of unique harm.

### 3. The Counseling Censorship Law cannot survive strict scrutiny because it is not the least restrictive alternative.

The Defendants also cannot demonstrate that the Counseling Censorship Law is the "least restrictive means among available, effective alternatives." *Ashcroft,* 542 U.S. at 660, 665-66. Means less restrictive of free speech are evident; if New York City is concerned about harm caused by use of electroshock therapy, holding individuals against their will for therapy, or other practices legitimately characterized as "conduct," then New York City can prohibit electroshock therapy, holding individuals against their will, etc.[1]

### B. The Law is so vague that it violates Dr. Schwartz's right to due process protected by the 14th Amendment. (Count II)

The Counseling Censorship Law violates Dr. Schwartz's right to due process guaranteed by the Fourteenth Amendment because it is "so vague and standardless

---

[1] *See* Report and Recommendation, *Vazzo et al. v. City of Tampa*, No. 8:17-cv-2896-T-02AAS (M.D. Fla. Jan. 30, 2019), ECF No. 149 (recommending grant of preliminary injunction against similar city counseling censorship ordinance after noting plaintiff's probability of success in demonstrating that the ordinance was not the "least restrictive" alternative, where city could have enacted a narrower ban prohibiting only involuntary counseling, or "aversive" or electroshock therapy techniques, or requiring informed consent).

that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 55-56 (1999). Vagueness violates due process for two reasons. First, citizens "are entitled to be informed as to what the State commands or forbids." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). Second, vagueness "may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago*, 527 U.S. at 56. Courts are particularly concerned about vagueness when First Amendment rights are at stake, because "the very existence of [such] statutes may cause persons not before the Court to refrain from engaging in constitutionally protected speech or expression." *Young v. Am. Mini Theaters*, 427 U.S. 50, 60 (1976).

The Counseling Censorship Law is hopelessly vague, and invites both these ills. The law permits counseling that facilitates "identity exploration and development" regarding sexual orientation and identity, but prohibits counseling that seeks "change." Since "development" of any sort involves "change," the statute is irredeemably contradictory and thus vague on its face. Likewise, the law provides no definition of "gender identity," "sexual orientation," nor of "identity exploration and development"—decidedly vague terms.[2] If a male patient says, "I've had attractions to both women and men, but I want you to help me get distance from those same-sex attractions so that I can marry and have a stable relationship with my wife," is that a request for "exploration," "development," or "change"? There is no

---

[2] See the definitions cited in the Complaint ¶¶ 121-124, including: "Gender identity can be conceptualized as a continuum, a Mobius, or patchwork" (Compl. ¶ 122).

way to know. This is not reasonable notice.

The vagueness is compounded because the Counseling Censorship Law specifies nothing at all about the prohibited speech except its *intent*. "That is to make freedom of speech turn not on what is said, but on the intent with which it is said" with the result that citizens "become entangled in the law not for what they did but for what they thought . . . ." *Dennis v. United States*, 341 U.S. 494, 583 (1951) (Douglas, J., dissenting).

Worse, the question of violation may turn on the unspoken intent of the *patient*, while it is the counselor who is at risk. The subject in the statutory text is indeterminate, prohibiting "services . . . that seek to change." Services, of course, do not "seek"; *people* seek. If a patient says, "I'm not attracted to women, and I want you to help me understand why," may a psychotherapist provide that help? Is the counselor obliged to interrogate his patient as to whether the patient seeks to "change" or only "develop" or merely "understand" his attractions? What if the patient's personal goal changes across time from one of self-understanding to one of "change"? Must the counselor continually interrogate his patient's goals on an ongoing basis, and shut down the conversation if those goals change to "change"? The counselor is put in an impossible situation; the patient, in a cruel one.

## II. The Counseling Censorship Law violates free speech rights and protected liberty interests of the clients of Dr. Schwartz. (Count III)

### A. Dr. Schwartz has standing to assert the rights of his patients threatened by the Counseling Censorship Law.

Dr. Schwartz has standing to assert the rights of his patients violated by the Counseling Censorship Law. Such standing should be recognized where the party

"has a 'close' relationship with the person who possesses the right," and where there is also some "hindrance to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). These considerations exist strongly here.

First, Dr. Schwartz has an extremely close relationship with patients who seek his assistance with goals relating to relationships and sexual attractions. Therapeutic conversations relating to such topics are intensely sensitive, intimate, and important for patients, and "candor is crucial." *NIFLA*, 138 S. Ct. at 2374; *see also Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984) (fund-raising company may assert free speech rights of client charities, where the protected interest was "at the heart of the . . . relationship between Munson and its clients").

Second, there are multiple obstacles to psychotherapy patients "protect[ing] [their] own interests." As was true in *Eisenstadt*, the Counseling Censorship Law does not prohibit *receiving* counsel, so Dr. Schwartz's patients "are not themselves subject to prosecution and, to that extent, are denied a forum in which to assert their own rights." 405 U.S. at 446.

Further, it is extremely difficult or even impossible for these patients to step forward to vindicate their own rights to engage in therapeutic conversations with Dr. Schwartz. (Schwartz Decl. ¶ 63.) These patients already experience emotional turmoil, and it is hardly speculative to predict that putting their personal difficulties into the spotlight of litigation would cause additional anguish and harm. (*Id.* ¶¶ 62, 64.) Further, their desire is typically to build or strengthen a family

19

based in a husband-wife union, and public disclosure of present or past same-sex attraction could damage their prospects of achieving such a marriage. (*Id.* ¶ 65.)

Finally, where First Amendment rights are threatened, the rules for standing are relaxed. *Joseph H. Munson Co.*, 467 U.S. at 956. In particular, standing will readily be found "when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth v. Seldin*, 422 U.S. 490, 510 (1975); s*ee also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (advertisers may assert readers' right to receive information). This concern is present here.

### B.   The Counseling Censorship Law violates the right of Dr. Schwartz's patients to receive desired information and counsel.

"The right of freedom of speech and press includes not only the right to utter or to print, but . . . the right to receive, the right to read." *Griswold*, 381 U.S. at 482; *see also Va. State Bd. of Pharmacy*, 425 U.S. at 756 ("the protection afforded is to the communication, to its source and to its recipients both"). Thus, "enforcement of the challenged restriction against [Dr. Schwartz] would result indirectly in the violation of third parties' rights." *Warth*, 422 U.S. at 510.

### III.   The Counseling Censorship Law violates the free exercise rights of Dr. Schwartz and of his clients. (Counts IV & V)

As explained above, the Counseling Censorship Law is unconstitutional to anyone. And it is unconstitutional as applied to Dr. Schwartz on the additional grounds that it forecloses the religious exercise of Dr. Schwartz and his patients. The right to "free exercise" includes not merely the right to *believe,* but to *exercise*

one's faith. This includes the right to "the *performance* of (or abstention from) physical acts," as well as the right to "*profess* whatever religious doctrines one desires," *Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990) (emphasis added), along with "communicating" these teachings to others so that they may live according to that faith. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring); s*ee also Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 439 (2d Cir. 1981) ("courts will . . . invoke free exercise analysis where a belief is . . . acted upon in good faith."). We trust that the City will not doubt the good faith and sincerity of Dr. Schwartz and his clients in accepting the Orthodox Jewish teaching that a procreative marriage between man and woman is both a blessing and a moral obligation to pursue. (Schwartz Decl. ¶¶ 46-54); *see also Obergefell*, 135 S. Ct. at 2594 (noting that the belief that marriage can only be between a man and a woman is held "in good faith by reasonable and sincere people").

> **A.   The Counseling Censorship Law violates free exercise rights because it interferes with the right of patients to pursue their chosen goals, and the right of Dr. Schwartz to advise them consistently with historic teachings of their shared faith.**

In some settings, the boundary line between government power and Free Exercise is currently traced by the test articulated in *Smith*, 494 U.S. 872 (1990). However, while satisfying the *Smith* test is a necessary threshold for the government, it is not always sufficient. The Supreme Court has expressly rejected the idea "that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause," *Trinity Lutheran*

*Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017). It has also stated (in the context of faith-based education) that the contention that satisfaction of *Smith* neutrality grants the state a license to interfere in historically respected areas of religious autonomy "has no merit." *Hosanna-Tabor*, 565 U.S. at 190 (unanimously barring application of employment discrimination laws against teacher in religious school on free exercise grounds, without application of *Smith* test). Notably, the *Smith* test has never been applied to permit a government to suppress pure speech because it dislikes its purpose or message.

When considering fundamental clashes between ostensibly neutral laws and faith-based teachings, courts have considered what could be called the historical depth of the claimed religious conviction. *See, e.g., Hosanna-Tabor*, 565 at 182-87 (tracing history of ministerial independence); *see also Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 442 (protecting practice of soliciting contributions that traces "since ancient times"). It will hardly be disputed that the question of what is right and wrong with respect to relationships between men and women, marriage, and family life—what will lead towards a whole life and society and what will not—has been a central concern of religions including at least Judaism, Islam, and Christianity since ancient times. Religious teachings about the highest answer to this question have ranged from celibacy to the command given in Eden that a "man shall leave his father and mother, and be joined to his wife" (Genesis 2:24), so that they can "be fruitful and multiply." (Genesis 1:28). Teaching and counsel directed to right ordering in the realm of sex, marriage, and family is central to the content and

propagation of religious faith.

Equally, the Orthodox Jewish tradition—in common with other religions—teaches that individuals *should* feel guilty when they do what is wrong, and that they *can* and should change to bring themselves into alignment with what is right. Likewise, it teaches that the moral instructions of the Torah concerning sexuality are more important than an individual's subjective feelings. For example, the Seventh Commandment, "Do not commit adultery," is to be obeyed regardless of one's sexual attractions. As with teachings about marriage, these teachings about right, wrong, guilt, obedience, and the ability of individuals to change are undoubtedly central, sincere, and ancient. The First Amendment flatly denies the City the power to tell an Orthodox Jew (or Christian, Muslim, Hindu, or any other believer) that he cannot seek the help of a trusted counselor to pursue a path of conduct in his life consistent with his faith, or to tell Dr. Schwartz that he cannot provide counsel that is informed by and consistent with his own faith and that of his patient.

The Second Circuit has left undecided the question of whether any separate "substantial burden" requirement remains for claims of free exercise violations after *Smith*, 494 U.S.872, 887 (1990). *See McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004). It is equally unnecessary to decide that here, as we trust that the City will not dispute that denying Dr. Schwartz and his patients the right to talk together about matters of sexual orientation and gender identity consistently with the teachings of their shared faith, and in furtherance of the patient's faith-based

goal of entering into a heterosexual marriage and forming a family, more than clears that "not . . . particularly onerous" hurdle, if it exists. *Id.*

### B. The Counseling Censorship Law violates free exercise rights because it cannot survive strict scrutiny.

As explained above, it is not necessary to engage in a *Smith* analysis to conclude that the Counseling Censorship Law is unconstitutional both facially and as applied to Dr. Schwartz. But applying the analysis set out in *Smith* leads to the same conclusion. "A law burdening religious conduct that is *not* both neutral and generally applicable . . . is subject to strict scrutiny." *Roman Catholic Diocese of Rockville Centre, N.Y. v. Incorporated Village of Old Westbury*, 128 F. Supp. 3d 566, 581 (E.D.N.Y. 2015) (citing *Lukumi*, 508 U.S. at 531–32).

For purposes of a free exercise claim, the Counseling Censorship Law triggers strict scrutiny because it was motivated by animus against a religious group, belief, or practice. *Lukumi*, 508 U.S. at 540-42; *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1722 (2018). In this evaluation, courts look at "specific series of events leading to the . . . policy in question," "the legislative or administrative history," and "contemporaneous statements . . . of the decisionmaking body." *Id.* (citing *Lukumi*, 508 U.S. at 540). Here, while New York City maintains only a thin legislative history, the limited record that exists presents evidence of targeted hostility to religion and the religious. (*See supra* at 7, 11-12.)

Next, "[a] law is . . . not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests

purportedly justifying it." *Central Rabbinical Congress of the U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014), (citing *Lukumi*, 508 U.S. at 535-38). As reviewed above (at 15-16), the Counseling Censorship Law is radically underinclusive with respect to the type of harm that it purports to address.

The City cannot meet its burden to demonstrate that the Counseling Censorship Law satisfies the requirements of strict scrutiny. As set forth above, the law does not serve any compelling governmental interest, and is both overbroad and underinclusive. (*See supra* at 13-16.)

## IV.   The balance of harms favors granting a preliminary injunction.

Once a likelihood of success in establishing a First Amendment violation has been established, no separate "balance of harms" analysis is necessary to conclude that a preliminary injunction should issue. (*See supra* at 1-2.) The violation of Dr. Schwartz's First Amendment rights constitutes irreparable harm, and the City has no cognizable interest in preventing the "harms from ideas" to citizens that the Counseling Censorship Law purports to avert. (*See supra* at 13-14).

## Conclusion

For the reasons set forth above, Dr. Schwartz respectfully requests that this Court issue a preliminary injunction prohibiting the City from taking or threatening any enforcement action both facially and as-applied against him under the Counseling Censorship Law pending entry of a final order in this case.

Respectfully submitted this 19th day of February, 2019.

<u>s/Roger G. Brooks</u>

Barry Black

Roger G. Brooks

NELSON MADDEN BLACK LLP

Jeffrey A. Shafer

The French Building

Jeana J. Hallock *

551 Fifth Ave., 31st Floor,

ALLIANCE DEFENDING FREEDOM

New York, NY 10176

15100 N. 90th Street

212-382-4300 (T)

Scottsdale, Arizona 85260

(480) 444-0020 (T)

rbrooks@adflegal.org

jshafer@adflegal.org

jhallock@adflegal.org

ATTORNEYS FOR PLAINTIFF

* Admitted *Pro Hac Vice*